## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>    Plaintiff, <br><br><br>      v. <br><br><br> ANTONIO DÍAZ-LÓPEZ, <br>    Defendant. | CRIM. NO. 21-157 (RAM-MDM) |

## REPORT AND RECOMMENDATION

### I.   BACKGROUND AND PROCEDURAL HISTORY

In the early morning hours of Friday, April 23, 2021, the defendant, Antonio Díaz-López ("Mr. Díaz-López" or the "Defendant"), was engaged in a physical altercation outside a residence in San Juan, Puerto Rico. Docket No. 37 at 1. A firearm appeared in the melee and a struggle ensued for control of the firearm. *Id.* During the struggle, the firearm went off and the Defendant claims to have been shot in the back of the head. *Id.* Puerto Rico police officers arrived on scene and found both men wounded on the ground. *Id.* at 2. They were each identified as suspects and arrested (the "April 23 Altercation"). *Id.* Mr. Díaz-López was transported by ambulance to the hospital (Centro Médico in Río Piedras, Puerto Rico) for apparent head trauma. *Id.*

While at the hospital, the Defendant received "medical treatment for the painful wound to his head." He also claims to have been administered "opioid-based pain medications, including morphine and oxycodone," throughout his six-day stay in the hospital to manage the "severe pain" from his head wound and the withdrawal symptoms from his long-time addiction to crack cocaine.

During his first four days in the hospital, Mr. Díaz-López was under the custody of the Puerto Rico Police Bureau ("PRPB"), whose agents remained at his

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 2 of 39

U.S. v. Antonio Díaz-López                                                    Page 2
Crim. No. 21-157 (RAM)(MDM)

bedside 24 hours a day. On Tuesday, April 27, 2021, however, they left, and no state charges were ever filed.

Two days later, during the morning hours of his sixth day in the hospital, Mr. Díaz-López was interviewed by Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") about the incident on April 23, 2021. That same afternoon, Mr. Díaz-López was interviewed by U.S. Probation Officers ("USPO") regarding the same incident. The USPO interviewed him because he had been under federal supervision since August 13, 2018. Mr. Díaz-López contends that he was not read his *Miranda* rights before providing incriminating statements to both ATF agents and the USPO during each interview, and that he did not provide his consent for the ATF agents to search his cell phone. In the alternative, he claims that his incriminating statements were given "involuntarily" because he was in "severe pain," was undergoing the effects of the opioid medications and he was suffering from withdrawal due to a long-time addiction to crack cocaine.

In the afternoon of Thursday, April 29, 2021, ATF agents returned to the hospital and arrested Mr. Díaz-López upon his discharge from the hospital. The next day, April 30, 2021 at 12:59PM, the USPO sought an arrest warrant based on defendant's alleged supervised release violations. At 4:22PM that same day, the Judge signed the arrest warrant for the Defendant. *See* Crim No. 14-224 (JAG) at Docket Nos. 52 and 55. On Monday, May 3, 2021, the Defendant was brought before then U.S. Magistrate Judge Camille Vélez-Rivé[1] for his initial appearance on the Motion Notifying Violations of Conditions of Supervised Release. *See Id.* at Docket No. 58.

On May 5, 2021, the grand jury returned an indictment against the Defendant charging him with one count of being a felon in possession of a firearm and ammunition, in violation of Title 18, *United States Code*, Section 922(g)(1) (the "Indictment").

---

[1] Camille Vélez Rivé has since been appointed U.S. District Judge for the District of Puerto Rico.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 3 of 39

U.S. v. Antonio Díaz-López                                                              Page 3
Crim. No. 21-157 (RAM)(MDM)

On February 11, 2022, the Defendant filed a Motion to Suppress ("Motion to Suppress") where he seeks to exclude the incriminating statements made to both the ATF Agents and the U.S. Probation Officers for failing to read him his *Miranda* rights and because he allegedly made his statements involuntarily. Docket No. 37. He also sought to exclude any evidence recovered from his cell phone based on lack of consent. *Id.* The Defendant further seeks suppression of his statements based on a violation of the *McNabb-Mallory* Rule, which requires that a defendant be brought before a magistrate judge "without unnecessary delay." *Id.* In a subsequent motion, the Defendant also requested that the Court hold an evidentiary hearing as to his Motion to Suppress. Docket No. 44.

On March 14, 2022, the Government filed an opposition to the Motion to Suppress ("Opposition") wherein it explains that Defendant's averments are inaccurate, the interviews were non-custodial such that *Miranda* warnings were not required, and the Defendant was fully competent to knowingly and voluntarily provide statements during the challenged interviews. Docket No. 46. On March 25, 2022, the Defendant filed a reply to the Opposition ("Reply"). Docket No. 52. On March 29, 2022, the Government filed a sur-reply to the Defendant's Reply to the Motion to Suppress ("Sur-reply"). Docket No. 55.

On April 4, 2022, finding that the Defendant had made "a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record," the presiding Chief District Judge Raúl Arias granted in part Defendant's Motion for an evidentiary hearing. More specifically, he granted Defendant's request that there be an evidentiary hearing but limited the presentation of evidence during that hearing to two subject areas: 1) Defendant's mental and medical condition on April 28 and 29, 2021; and 2) whether the Defendant was interviewed by ATF officers on April 28 or April 29, 2021. *See* Docket No. 58.

Originally, the suppression hearing was scheduled to be heard before Judge Arias. On November 7, 2022, however, the matter was referred to the undersigned to hold a suppression hearing and prepare a Report and Recommendation. Docket No. 80.

On December 13, 2023, the undersigned heard testimony on the first day of the suppression hearing. During that first day of hearing, the Government called a total of four witnesses to the stand. The first witness was Dr. Pablo Cantero, the physician who treated the Defendant after he was admitted to the hospital. It next called ATF Special Agent Raul Peña, a Digital Forensic Examiner, who was asked to conduct cell phone extractions on the government issued cell phones belonging to ATF Special Agent ("SA") Johnathan Vega and ATF Task Force Officer ("TFO") Joel Colón Justino. The Government then called to the stand ATF TFO Joel Colón Justino regarding his participation in the interview of the other individual engaged in the April 23 Altercation (hereinafter to be referred to as the "Victim") and of the Defendant, which interviews took place on April 28 and April 29, 2021, respectively. And lastly, the Government called U.S. Probation Officer Guillermo Montañez to testify regarding his participation in the interview of the Defendant on April 29, 2021. The Government admitted into evidence Exhibits 1-18 and then rested.

On January 12, 2023, the Court reconvened the Suppression Hearing, during which the Defendant called two witnesses to the stand. The first witness was Dr. Juan Pérez-Rodríguez, the emergency room physician who treated the Defendant upon his arrival by ambulance to the ER. The second witness called was the defendant himself, Antonio Díaz-López. The defense admitted into evidence Exhibits A & B and then rested.

At the conclusion of the hearing, the Defendant requested that the Court order simultaneous briefing. Finding more utility in consecutive briefing, the Court ordered the defense to file a post-hearing brief within thirty (30) days from when the transcript was made available, and the Government to file its post-hearing brief thirty (30) days thereafter.

On March 19, 2023, the defendant filed his post-hearing brief ("Defendant's Post-Hearing Brief"). Docket No. 110. On April 28, 2023, the Government filed its opposition to the Defendant's Post Hearing Brief ("Opposition to the Defendant's Post-Hearing Brief"). Docket No. 114. No reply was filed.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 5 of 39

U.S. v. Antonio Díaz-López                                                    Page 5
Crim. No. 21-157 (RAM)(MDM)

After listening to all the witnesses during the suppression hearing and making the necessary credibility assessments, the Court notes that the facts as initially presented in the Defendant's Motion to Suppress bear little resemblance to the facts as meted out during the suppression hearing.

After careful consideration of the arguments raised by the parties during the suppression hearing, and based on the factual findings and legal analysis that follows, the undersigned recommends that the Motion to Suppress be **DENIED**.

## II. THE COURT'S FINDINGS OF FACT

After listening to the five witnesses who testified during the two-day evidentiary hearing and evaluating the briefs submitted by the parties, the Court makes the following findings of fact.

### A. The April 23 Altercation

On September 17, 2014, the Defendant pleaded guilty to one count of possession with intent to distribute controlled substances in Crim. No. 14-224 (JAG). On December 22, 2014, the Honorable Jay García Gregory sentenced the Defendant to sixty (60) months incarceration, followed by three (3) years of supervised release. His three-year term of supervised release commenced on August 13, 2018, and was set to expire on August 12, 2021. *See* Docket No. 52 at 1 in 14-224 (JAG).

On April 23, 2021, in the very early morning hours, while still serving a term of supervised release in Crim No. 14-224 (JAG), the Defendant drove to Guayama Street, in San Juan, with the admitted intent of "teaching a lesson" to the Victim who was suspected of "committing robberies" in the area. (Docket 100 at 142). The area subjected to the robberies purportedly belonged to associates of the Defendant and he went there to "quemarle las patas," or "burn the legs" of the Victim, which in street talk means "to shoot him in the legs."

During the altercation, the Victim ended being shot in the head and in the left clavicle, while the Defendant received a scrape to the back of the head, which he

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 6 of 39

U.S. v. Antonio Díaz-López                                                    Page 6
Crim. No. 21-157 (RAM)(MDM)

claimed was a "gunshot wound." After the police arrived, the Defendant was transported to the ASEM[2] emergency room ("ER").

**B. The Defendant's arrival and treatment at the Emergency Room**

Upon his arrival at the ER, the Defendant was first seen by Dr. Julio Pérez ("Dr. Pérez"), an experienced emergency room doctor at ASEM with over 20 years' experience working with trauma patients. (Transcript "Tr." 197, line 1). His responsibilities at ASEM included tending to trauma patients from automobile accidents, gunshot wounds, knife wounds and falls. Tr. 197, lines 3-5. Dr. Pérez estimated that he has tended to somewhere between 2000 and 3000 gunshot wounds in his career. Tr. 197, line 9.

The Defendant's medical progress notes, dated April 24, 2021, indicate that during his stay in the emergency room, Mr. Díaz-López was given morphine (*see* Ex. 1, Docket No. 105-1 at 1) and that the morphine made him "somnolent, drowsy, and almost unresponsive." Tr. 70, lines 3-19. *See also* Ex. 1, Docket No. 105-1 at 1.

Dr. Pérez conducted an initial physical evaluation of the Defendant and noted that he had a "scrape wound" (described by the witness in Spanish as a "chanfletazo") to the left temporal side of his head. Tr. 199, lines 19-22. *See also* Ex. B, Docket No. 106-3 at 2. Dr. Pérez explained that all patients that come into the emergency room with an injury have to undergo pertinent studies. For example, they must undergo basic lab work, and in this case, a head CT Scan and x-rays were recommended. Tr. 199, line 23 to Tr. 200, line 4.

As the different test results trickled in, Dr. Pérez noted that the Radiologist determined that the Defendant did not have any bone injuries or internal brain injuries. Tr. 200, lines 7-11. The CT Scan results further showed "no intercranial consequence of injuries" and "no evidence of skull fracture either." Tr. 59, lines 14-18.

Meanwhile, the Defendant's lab results confirmed that he had tested positive for cocaine. Tr. 202, lines 3-6; *See also* Ex. B, Docket No. 106-3, Page 7. They also

---

[2] ASEM is an acronym in Spanish which stands for "Medical Services Administration of Puerto Rico," which is a part of Centro Médico in Río Piedras.

confirmed that he had an abnormally high level of white blood cells, which were hovering around 19,000. Tr. 202, 204; *See also* Ex. B, Docket No. 106-3 at 8. Dr. Pérez explained that an increase in white blood cells is not unusual in trauma patients as it is often caused by a chain reaction to inflammation. In such cases, the white blood cells often come back elevated at around 14,000-15,000. But levels reaching 19,000 like those found in Defendant's case, he said, would indicate other causes unrelated to simple inflammation caused by trauma. Tr. 202, lines 20- 203, line 1. Based on Mr. Díaz-López' very high white blood cell count, Dr. Pérez ordered a lactic acid test be done. Tr. 203, lines 2-8.

Lactic acid is a measure that gives alerts related to possible damage to tissue. Tr. 204, line 4-6. A high lactic acid and a high white blood cell count could lead to secondary effects in the patient's organs such as the kidneys. Tr. 203, L.12-16. A high white blood count also leads to additional consultations from internal medicine specialists and nephrologists. Tr. 204, lines 15-17.

When Dr. Perez' shift ended that day in the ER, Dr. Aloida Lameiro ("Dr. Lameiro"), also an emergency room doctor, took over Mr. Díaz-López' care. Tr. 237. After examining Mr. Díaz-López and reviewing his medical record, Dr. Lameiro requested a consultation from the hospital's Internal Medicine Unit to address the high white blood cell count and the results of the lactic acid test. *See* Ex. B, Docket No. 106-3 at 19.

### C. The Defendant's admission to the hospital for pneumonia and kidney failure

As part of the Internal Medicine consultation, Mr. Díaz-López was seen by Dr. Pablo Cantero ("Dr. Cantero"), an Internal Medicine physician with a sub-specialization in Cardiology. Tr. 39-40.; *see also* Ex. 1, Docket No. 105-1. Dr. Cantero treated Mr. Díaz-López throughout his entire hospitalization from April 24 through 29, 2021. Tr. 39.

During his initial examination, Dr. Cantero diagnosed Mr. Díaz-López with "pretty severe" pneumonia (Tr. 39, lines 13-15) and kidney dysfunction. Tr. 44, lines 21-23, Tr. 39, lines 10-13; Tr. 45, lines 16-22. Mr. Díaz-López also had low

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 8 of 39

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 8

oxygenation at room air (Tr. 44, lines 21-23) and intermittent coughing and crackles, which meant he had fluids in his lungs consistent with an infectious process of the lungs. Tr. 48, lines 22-25; P 49, lines 8-12. Dr. Cantero stated that Mr. Díaz-López' kidney failure could lead to electrolyte disturbances that could provoke arrythmias which could end in death. Tr. 45, lines 16-22. Because of these medical conditions, Dr. Cantero ordered Mr. Díaz-López to be admitted to the hospital. *Id.*; Tr. 48, lines 4-8.

### D. The Defendant was not diagnosed with or treated for a gunshot wound to the head.

When asked by counsel for the Government if Mr. Díaz-López would have been under his care if he had indeed suffered a bullet wound to the head, Dr. Cantero said, "No, prior screening would have led to [ ] a Neurosurgery admission or a trauma hospital admission." Tr. 39, line 14 to Tr. 40, line 3. In this case, however, Mr. Díaz-López was not admitted for neurosurgery or trauma but rather for internal medicine only. Tr. 40, lines 13-17.

Dr. Cantero acknowledged that a gunshot wound assessment was made, possibly by the physicians and nurses in the E.R. based on Mr. Díaz-López' initial complaints. Tr. 47, lines 6-9. Dr. Cantero confirmed however that those E.R. physicians and specialists did not believe that Mr. Díaz-López had a bullet wound and did not order treatment for head wound trauma. Tr. 98, line 25 to Tr. 99, lines 1-3.

Notwithstanding that gunshot wound assessment conducted by those other physicians, Dr. Cantero himself evaluated Mr. Díaz-López for bullet wounds just in case he needed to refer him to the appropriate physicians since bullet wounds were not his area of expertise. Tr. 42. During that examination, he did note that Mr. Díaz-López had a couple lacerations on his forehead, but there was no bullet wound, no skull fracture and no intercranial bleeding. Tr. 42, lines 11-18. In the end, Dr. Cantero's understanding was that Mr. Díaz-López did not have a bullet wound to his head. Tr. 42, line 12; Tr. 49; Tr. 98, lines 19-21.

Dr. Cantero did observe a laceration on Mr. Díaz-López' head (Tr. 84, lines 1-2) and some facial lacerations, however, no bullet wound injury was identified. Tr. 48,

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 9 of 39

U.S. v. Antonio Díaz-López                                                    Page 9
Crim. No. 21-157 (RAM)(MDM)

lines 14-15. Dr. Cantero said he did not know how the lacerations got there but that it probably had to do with the details given to him by Mr. Díaz-López (Tr. 84, lines 6-7)—that someone had fired a gun at him twice scraping his head. *Id.*, at lines 20-22; *See also* Ex. 1, Docket No. 105-1 at 1.

### E. Defendant was not diagnosed with or treated for cocaine withdrawal.

Dr. Cantero averred that Mr. Díaz-López was "pain free" during his initial evaluation of the Defendant (Tr. 43, line 18) and throughout his entire hospitalization. Tr. 61-68. Dr. Cantero testified that during his initial screening for the internal medicine consultation, Mr. Díaz-López was alert, active and oriented in person, place, and time, speaking in full sentences, and he gave details of what happened on the day that led him to the emergency room. Tr. 41, lines 3-8. Dr. Cantero also mentioned that he did not observe any indication of nausea, vomiting, fever, chills, diarrhea, pedal edema, abdominal pain, dizziness, or dysuria when he first examined him. Tr. 51. He also averred that he never gave Mr. Díaz-López any pain medication at any time during his hospitalization from April 24 through 29, 2021. Tr. 68, 73.

When he was asked by his own counsel if he was given pain medication for his withdrawal symptoms, the Defendant answered, "No, the doctor said he was not going to give them to me because I was well." Tr. 245, lines 12-14. Indeed, on April 29, the day the Defendant was discharged from the hospital and the day he was interviewed by ATF Agents and U.S. Probation Officers. Dr. Cantero said the Defendant was "alert, he was active and 'oriented times 3.'[3] He was in no distress." Tr. 74, lines 9-10.

Actually, Dr. Cantero testified that:

> in terms of [the Defendant's] mental condition, the patient stayed stable during the whole hospitalization. He was always alert, active and oriented as mentioned and he was

---

[3] "Oriented times 3" means that the Defendant was oriented in "*person*, *place* and *time*." Other times when Dr. Cantero said the Defendant was "oriented times 3" include Tr. 41, lines 3-7; Tr. 48, lines 19-21; Tr. 51, lines 17-21; Tr. 54, lines 4-6; Tr. 54, lines 20-21; Tr. 57, lines 1-2; Tr. 57, lines 19-22; and Tr. 58, lines 17-19.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 10 of 39

U.S. v. Antonio Díaz-López                                                    Page 10
Crim. No. 21-157 (RAM)(MDM)

never in any acute distress. In terms of his medical symptoms, his oxygenation improved during the hospitalization. He was oxygenating well. So, clinically he improved the pneumonic process." Of initial worry was the kidney dysfunction which improved during the hospitalization as well and we scheduled a nephrology evaluation which suggested that the patient could be followed on an ambulatory basis or other outpatient basis.

Tr. 51, line 18 through Tr. 52, line 5.

With respect to his condition on April 28 or 29, 2021, Dr. Cantero was asked if the Defendant was "suffering from any headaches, stomach aches, muscle pain, chills, nausea or difficulty concentrating? To wit he said, "Not to the best of my knowledge." Tr. 74, lines 12-17.

### F. The April 28 interview of the Victim at his Guayama Street residence by ATF Agents

On April 28, 2021, between approximately 2:00PM and 3:00PM, ATF TFO Joel Colón ("TFO Colón), together with ATF SA Jonathan Vega and ATF SA Orlando de Jesús, interviewed the Victim at his Guayama Street residence. Tr. 126, lines 7-14. During that interview, TFO Colón took two photos of the Victim using the camera on his government issued cellphone. TFO Colón further stated that that was the only interview that he and his colleagues conducted that day. Tr. 128, lines 8-10.

In order to corroborate TFO Colón's testimony that the interview of the Victim did indeed take place on April 28 and not April 29 as alleged in the Motion to Suppress, the Government called ATF SA Raúl Peña ("SA Peña") to testify as to his findings as a Digital Forensic Examiner in this case. Tr. 102, line 1.[4] SA Peña explained that he was asked to conduct a cell phone extraction of two government issued cellphones, one that belonged to ATF SA Jonathan Vega ("SA Vega"), and another that belonged to TFO Joel Colón. Tr. 102, lines 19-25. Forensic Reports regarding those two extractions were admitted into evidence as Government's Exhibits 12 (SA Vega's phone) and 13 (TFO Colón's phone). Tr. 103-106.

---

[4] SA Peña explained that he has been a Special Agent with the ATF since 2008. Tr. 102, at line 6. In 2012, he started conducting cell phone extractions (id. at lines 9-10) and has since conducted hundreds of cell phone extractions. *Id.* at lines 11-15.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 11 of 39

U.S. v. Antonio Díaz-López                                                    Page 11
Crim. No. 21-157 (RAM)(MDM)

Exhibit 13 highlighted, among other things, two photos showing the left side of the Victim's head and his left shoulder. Together, the photos depict the nature and extent of the wounds the Victim purportedly suffered during the April 23 Altercation. Tr. 126, line 14. SA Peña explained that the metadata related to those two photos indicates that they were taken within seconds of each other at approximately 2:51PM on April 28, 2021. Tr. 112-16. This fact is consistent with, and duly corroborated by TFO Colón's testimony.

### G. The April 29 interview of the Defendant by ATF Agents at Centro Médico

The day after their interview of the Victim, namely on April 29, TFO Colón together with ATF SA Jonathan Vega and ATF SA Orlando de Jesús visited Centro Médico to interview the Defendant regarding the events that occurred during the April 23 Altercation. Tr. 136. All three of the agents were dressed in plain clothes and, though they were all armed, no weapons were visible. Tr. 153, lines 13-14.[5]

TFO Colón explained that when he and his colleagues arrived at the Defendant's room, he was completely alone, sitting in bed. Tr. 137, lines 20-23. He was not under any type of police custody, he wasn't restrained in any way, and there were no other patients assigned to that same room. Tr. 137, lines 20-21. TFO Colón described him as "completely alert," "not drowsy," and not connected to an IV.[6] Tr. 138, lines 2-4. "He was completely normal, lucid and coherent." Tr. 138, lines 4-5.

Then, after explaining to the Defendant the purpose of their visit, SA Orlando De Jesús read the Defendant his *Miranda* rights from the official ATF approved Form. *See* Exhibit 16; Tr. 138, lines 6-15. The Defendant placed his initials next to each particular right listed at the top of the Form, signed the Form on the signature line, and printed his name below his signature. Tr. 140, lines 15-25. TFO Colón then signed the Form as a witness and affixed the date, "04/29/2021." *Id.* TFO Colón said

---

[5] The Defendant corroborated this statement when asked during the hearing, "Do you recall if they were armed?" to wit he responded, "No, I didn't see any weapon." Tr. 244, lines 17-18.

[6] The Defendant admitted during the evidentiary hearing that he had the "catheter where the needle goes" for the IV in his arm, but that he was not connected to any intravenous tube. Tr. 250-251.

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 12

that all of this occurred between approximately 9:40AM and 10:00AM.[7] Tr. 139, lines 10-11.

After signing the *Miranda* Rights Form, the agents began the interview. Tr. 141, lines 4-5. TFO Colón described the Defendant's demeanor as "completely normal. You could tell he was coherent, alert." Tr. 142, line 14. TFO Colón mentioned that the Defendant even went to the bathroom "on several occasions" during the interview. Tr. 141, lines 9-10.[8]

The Defendant explained how he had been hired to "burn the legs" of the Victim because he had committed several robberies in the area. Tr. 142, lines 19-21. TFO Colón clarified that neither he nor his colleagues offered anything to the Defendant or made any promises in exchange for his cooperation. Tr. 143, lines 7-10.

TFO Colón explained that at some time toward the end of the interview, the Defendant was given a consent form to allow the agents to review his cellphone. Tr. 144-45  After the Defendant signed the Consent to Search Form, TFO Colón said he searched the phone in the presence of the Defendant and determined that it had no evidentiary value, so he returned it to the Defendant prior to their leaving the hospital.[9] *See* Ex. 18. When the agents left the hospital, the Defendant remained there on his own care. Tr. 161, lines 6-9. He had not been placed under arrest at that time. *Id.*

SA Vega and TFO Colón both said that at some point during their interview they took pictures of the Defendant using their government issued cellphones. SA Vega took three photos and TFO Colón took five photos. *See* Ex. 12 and Ex. 13. SA Peña testified that he found those photos as part of the cellphone extractions he performed. The metadata associated with the three photos SA Vega took of the

---

[7] The Defendant disputes that he signed the *Miranda* Rights Form in the hospital and instead claims he signed it while at the precinct the next day under arrest. Tr. 249. He then admits that he was not under arrest when the agents interviewed him at the hospital. Tr. 249, lines 2-15

[8] The Defendant disputes that he went to the bathroom on "several occasions" during the interview. Instead, he contends that he "never got up from the bed." And "did not go to the bathroom. I was seated on the bed at all times." Tr. 263, lines 7-12.

[9] The Defendant's consent to search his cellphone was an issue raised in the Motion to Suppress. Because the Government found nothing of value on the phone, there is nothing to suppress. Therefore, any argument raised in favor of suppression related to the cellphone is clearly moot.

Defendant indicate that they were taken within seconds of each other on April 29, 2021, at approximately 10:01AM. Tr. 112, lines 7-21. The metadata associated with the five photos of the Defendant that were taken with TFO Colón's cellphone indicate that they were taken within seconds of each other on April 29, 2021, at approximately 10:05AM. Tr. 112, lines 7-21.

In addition, the extraction report from TFO Colón's cellphone indicates that the GPS/geotagging function was enabled on his phone, but not on SA Vega's phone. That necessarily means that the metadata for TFO Colón's phone also provided geolocation information for each photo he took of the Defendant. Based on that metadata, SA Peña was able to pinpoint the exact location where each of the five photos was taken. In each case, the photo was taken at the Centro Médico hospital.[10] Tr. 113-114.

The metadata for the photos of Defendant admitted into evidence corroborates the testimony of the agents regarding when the Defendant's interview was conducted, that is, on April 29, 2021, at approximately 10:00AM.

### H. The April 29 interview of the Defendant by U.S. Probation Officers at Centro Médico

Around 2:00PM on April 29, 2021, USPO Joseline Pérez ("USPO Pérez") visited Centro Médico to interview the Defendant regarding possible violations of his conditions of supervised release. Tr. 168. USPO Pérez had received information from law enforcement that the Defendant was involved in an altercation where it was alleged that both he and another person had received gunshot wounds. Tr. 176, lines 18-23. USPO Pérez was familiar with the Defendant because she was the Probation Officer assigned to his supervision. Tr. 168, lines 24-25. The Defendant had been sentenced to serve sixty (60) months incarceration followed by three (3) years of supervised release after pleading guilty to one count of possession with intent to distribute controlled substances in Crim. No. 14-224 (JAG). Prior to leaving the office

---

[10] SA Peña explained that the metadata for each photo provided coordinates in the form of longitude and latitude delineating the exact location where each photo was taken. He then entered those coordinates into Google Maps and the exact location for each photo came back as Centro Médico.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 14 of 39

U.S. v. Antonio Díaz-López                                                        Page 14
Crim. No. 21-157 (RAM)(MDM)

for Centro Médico, USPO Pérez sought the assistance of a supervisor in her office to accompany her for the interview. Supervisory USPO Guillermo Montañez ("USPO Montañez") volunteered to accompany her. Tr. 167. USPO Montañez has worked for the U.S. Probation Office for twenty (20) years and has acquired significant experience in dealing with people suffering from severe mental illness, persons under medication, and drug addicts experiencing withdrawal symptoms. Tr. 166, lines 15-20.

When USPO Pérez and USPO Montañez arrived at the Defendant's hospital room, the Defendant immediately recognized her as his assigned supervisor. Tr. 168-69; Tr. 250-51. He was standing up, fully dressed, and not hooked up to an IV. Tr. 169, lines 22-24; Tr. 250-251. He greeted them courteously and respectfully, and he made good eye contact. *Id.* "His speech wasn't slurred" and "he was aware of their presence." Tr. 169-70. USPO Montañez indicated that he "did not observe anything out of the ordinary." Tr. 170, lines 4-5. Indeed, in his opinion, based on his twenty years of experience, the Defendant "was well, he was lucid," and "he was coherent in both time and space. There was no indication that he was under the influence of anything." Tr. 170, lines 18-21.

After explaining to him the reason for their visit, the Defendant asked his female companion to leave the room so he could speak with the probation officers alone. Tr. 169, lines 1-8. USPO Pérez then gave the Defendant a brief summary of the information she had received from law enforcement. Tr. 169, lines 14-19. The purpose and tone of the interview was to obtain as much information as possible regarding the events surrounding the police intervention. Tr. 170, lines 23-25. USPO Pérez advised the Defendant that "the truth is the best option for everyone regardless of whether you're in supervision or not." Tr. 171, lines 1-3. She also advised him that she would file a motion to the Court based on the preliminary information she had and that the information in the motion could result in his arrest. Tr. 171, lines 4-8. In response, the Defendant said, "I'm okay. I understand. I'll be waiting for whatever happens." Tr. 171, 8-9.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 15 of 39

U.S. v. Antonio Díaz-López                                                                    Page 15
Crim. No. 21-157 (RAM)(MDM)

Eventually, the Defendant shared with USPO Pérez that "an individual was stealing at a community belonging to some associates of his and those associates asked him to teach the [V]ictim a lesson and so he went there to shoot him." Tr. 171, line 16-19. While the defendant was making these statements, USPO Montañez said the Defendant "was aware that what he was saying would have consequences with the court and his supervision process." Tr. 171, lines 22-25. And when USPO Pérez said she would be filing a motion for his arrest, the Defendant said "Yeah, I'm aware [that] that would be the consequences of my actions." Tr. 172, lines 1-2. Overall, the interview lasted approximately 40-45 minutes. At no point during the interview did USPO Pérez advise the Defendant of his *Miranda* rights, that is, the right to have counsel present and the right to remain silent. Tr. 183, lines 9-17.

Once the interview concluded, USPO Pérez and USPO Montañez left the hospital while the Defendant remained in his room waiting to be discharged. Later that same day, ATF Agents returned to the hospital and placed the Defendant under arrest. He was taken to the Juan Domingo precinct where he stayed overnight.

The next day, Friday, April 30, 2021, at 12:59PM, a Motion Notifying Violations of Conditions of Supervised Release was filed by USPO Pérez in Crim. No. 14-224 (JAG). Docket No. 52. Approximately three and a half hours later, at 4:22PM, the Honorable Jay García Gregory issued an arrest warrant for the Defendant pursuant to the Motion Notifying Conditions of Release. *See* Crim No. 14-224 (JAG) at Docket Nos. 55.

On May 1, 2021, U.S. Marshals executed the arrest warrant for Díaz-López at the Juan Domingo Police Station in Bayamón.

On Monday, May 3, 2021, the Defendant was brought before then U.S. Magistrate Judge Camille Vélez-Rivé for his initial appearance on the Motion Notifying Violations of his Supervised Release. *See Id.* at Docket No. 58.

On May 5, 2021, the grand jury returned an indictment against the defendant charging him with one count of being a felon in possession of a firearm and ammunition, in violation of Title 18, *United States Code*, Section 922(g)(1) (the "Indictment").

### III.  LEGAL DISCUSSION

### A. The Defendant lacks credibility.

The facts as meted out during the evidentiary hearing bear little resemblance to the facts as initially presented by the Defendant in the Motion to Suppress. That became clear to the Court after an evaluation and comparison of the Defendant's unsworn declaration under the penalty of perjury (the "Unsworn Declaration Under Penalty of Perjury"), which serves as the basis for all of the factual and legal arguments in the Motion to Suppress, and the facts established by the credible testimony provided by the other witnesses during the evidentiary hearing. Docket No. 37-1.

For example, in his Unsworn Declaration Under Penalty of Perjury, the Defendant certified, under the penalty of perjury, that the following facts were true and correct:

1. On April 23, 2021, I received a gunshot wound to the back of my head, causing me to lose consciousness. When I woke up, I was in sever[e] pain in my head, neck and shoulders.

* * *

3. During my hospitalization, I continued to feel severe pain. I received medications for my wounds including strong pain medication. I believe the medications were injected into me intravenously, through an "I.V." The medications made me drowsy and confused, among other things.

4. During my hospitalization, I was going through withdrawal symptoms because of my drug addiction. The withdrawal symptoms I was experiencing included headaches, stomach aches, muscle pain, chills, nausea and difficulty concentrating.

* * *

6. . . . The day ATF agents interrogated me I was connected to an I.V., was receiving medication and was experiencing withdrawal symptoms.

7. During the interrogation, I was never read my *Miranda* Warnings, and I never signed any documentation. Nor did I give consent to search my cell phone.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 17 of 39

U.S. v. Antonio Díaz-López                                                                 Page 17
Crim. No. 21-157 (RAM)(MDM)

8. I was given a *Miranda* Warning Form and a Consent to Search my Cellphone Form the day after my interrogation.

9. During the ATF interrogation, ATF agents questioned me about the events of April 23, 2021. I had difficulties answering the questions because of the medication I was receiving, my physical pain, the physical and psychological withdrawal symptoms and my mental state.

10. Also, at some point during my hospitalization, a group of probation officers; including my assigned officer, questioned me about the events of April 23, 2021. I had difficulties answering the questions because of the medication I was receiving, my physical pain, the physical and psychological withdrawal symptoms and my mental state.

After having listened to all of the witnesses, having reviewed the entire record in this case, and having studied the briefs submitted by the parties, the Court finds that the abovementioned facts taken from the Defendant's Unsworn Declaration Under Penalty of Perjury are either 1) outright falsehoods, 2) self-serving statements uncorroborated by any other evidence in the record, or 3) self-serving statements contradicted by other more credible evidence and testimony. The Court explains.

1. *The record shows that Defendant suffered little more than a scratch to his head, irrespective of whether it was from an actual gunshot wound or not.*

In his Motion to Suppress, the Defendant misleadingly presents facts to give the impression that he suffered a gunshot wound to the head that was so severe that it required him to be hospitalized for six days and required "[t]reatment including strong opioid-based pain medications, including morphine and oxycodone," administered through IV drips. Docket No. 37 at 3; s*ee also* 37-1 at ¶3. The defendant even goes as far to say that on May 3, 2021, some four days after his discharge from the hospital, "he was still disoriented, reporting to counsel that he had a 'bullet injury to the brain.'" Docket No. 37 at 4. Indeed, the evidence of record paints a remarkably different story.

After having spent less than one day in the emergency room, based solely on his own self-reporting that he suffered a gunshot wound (Tr. 47, lines 13-17),

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 18 of 39

U.S. v. Antonio Díaz-López                                                    Page 18
Crim. No. 21-157 (RAM)(MDM)

Dr. Cantero, an attending physician in the Internal Medicine Ward of Centro Médico, admitted the Defendant to the hospital for "pretty severe" pneumonia and kidney dysfunction, not for gunshot wound trauma. Tr. 39, lines 7-15. This diagnosis resulted from lab results indicating that Defendant's white blood cell count was elevated at around 19,000. Dr. Cantero testified that if his white blood cell count was elevated in the 14-15,000 range, then it might be attributable to mere inflammation. However, levels as high as 19,000 pointed to other medical issues. Tr. 202, lines 20-23.

Dr. Cantero, who the Court finds had no reason to lie, and whose testimony is corroborated by the Defendant's medical record, confirmed that the Defendant was not admitted to the hospital for anything having to do with a gunshot wound. Though Dr. Cantero did notice scrapes to the Defendant's face and the left side of his head, he explained that if those scrapes had been from a gunshot wound, the Defendant would have been admitted to the neurosurgery ward or trauma ward, not the internal medicine ward. Tr. 39, line 14 through Tr. 40, line 3.

In addition, the results of the x-ray and CT Scan of the Defendant's head both corroborated the fact that there was no injury consistent with a gunshot wound. The Radiologist who read the x-ray results confirmed that the Defendant did not have any "bone injuries or internal brain injuries" while the CT Scan showed that "there was nothing." Tr. 200 (x-rays), lines 7-11; Tr. 206, line 17 (CT Scan).

The Court finds, therefore, that Defendant's statement that he was hospitalized for six days due to a gunshot wound to be a gross misstatement of the facts that borders on an outright falsehood. While it is debatable as to exactly how he received the scratch on his head, the record could not be clearer that his admission to the hospital was due to severe pneumonia and kidney disfunction and not a gunshot wound. Indeed, neither "pneumonia" nor "kidney dysfunction" appear mentioned anywhere in Defendant's Unsworn Declaration Under Penalty of Perjury or in his Motion to Suppress.

And because the Defendant's argument in favor of suppression is based so heavily on whether or not he suffered a gunshot wound, his argument for suppression

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 19 of 39

U.S. v. Antonio Díaz-López                                                                    Page 19
Crim. No. 21-157 (RAM)(MDM)

of testimony based on involuntariness resulting from the impact of this false condition lacks credibility and merit.

> 2. *The record shows that Defendant did not suffer pain nor was he given any pain medications throughout his hospitalization.*

In paragraphs 3 and 4 of his Unsworn Declaration Under Penalty of Perjury, the Defendant presents a second misleading allegation when he claims that he was in constant pain and was under the effects of strong pain medication throughout his entire hospitalization. Such statements are falsehoods unsupported by the record.

To start with, Dr. Cantero testified that pneumonia and kidney dysfunction, the conditions for which he was admitted, generally do not cause pain. Tr. 81, lines 10-16. Kidney dysfunction, for instance, is "mostly a silent disease;" "[s]ome patients may even have it and never know." *Id.* at lines 11-12. "Pneumonia in very, very, rare instances can cause pain . . . but not in [Defendant's] case." *Id.* at lines 20-22.

Therefore, since neither the pneumonia nor the kidney disfunction could be the source of the pain, the Defendant posits that he suffered pain from the symptoms of withdrawal from his cocaine addiction. The problem with this proposition is that it is not supported by the evidence in the Defendant's medical record.

Dr. Cantero averred that Mr. Díaz-López never suffered from the symptoms of withdrawal from cocaine (to wit nausea, headaches, stomach aches, muscle pain, or difficulty concentrating) and that he was "pain free" during his initial evaluation of the Defendant (Tr. 43.) and throughout his entire hospitalization. Tr. 61-68.  He also averred that he never gave Mr. Díaz-López any pain medication at any time during his hospitalization from April 24 through 29, 2021. Tr. 68, 73.

Indeed, on April 29, the same day the Defendant was discharged from the hospital, and the same day that he was interviewed by ATF Agents and U.S. Probation Officers, Dr. Cantero said the Defendant was "alert, he was active and oriented times 3. He was in no distress." Tr. 74, lines 9-10. Dr. Cantero also commented that to the "best of his knowledge," the Defendant was not suffering from any headaches, stomach aches, muscle pain, chills, nausea, or difficulty concentrating

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 20

on either April 28 or 29, 2021. Tr. 74, lines 12-17. Furthermore, the nursing staff's pain assessment reports confirm that Defendant did not suffer pain from April 24, 2021, at 2:04PM, until he was discharged from the hospital on April 29, 2021. (Docket No. 105-10 at 2-23).

And finally, the best evidence showing that the Defendant lied in his Unsworn Statement Under Penalty of Perjury is that when he was asked by his own counsel during the evidentiary hearing if he was given pain medication for his withdrawal symptoms, the Defendant admitted, "No, the doctor said he was not going to give them to me because I was well." Tr. 245, lines 12-14. This admission contradicts the statements he made in his Unsworn Declaration Under Penalty of Perjury and discredit's Defendant's ability and intent to tell the truth in these proceedings.

### 3. *The Defendant's Declaration Under Penalty of Perjury falsely claims that the day ATF Agents interviewed him "he was connected to an IV, was receiving medication and was experiencing withdrawal symptoms."*

The Court has already mentioned that on April 29, Dr. Cantero's professional opinion was that the Defendant was not suffering from the symptoms of withdrawal because he did not have a headache, a stomachache, muscle pain, chills, nausea or difficulty concentrating. This opinion is further corroborated by TFO Colón, whose testimony the Court also finds highly credible, when he explained that when he and his colleagues arrived at the Defendant's hospital room, he was alone sitting in bed. Tr. 137, lines 20-23. The Defendant was "completely alert," "not drowsy," and not connected to an IV. Tr. 138, lines 2-4; Tr. 250-251. "He was completely normal, lucid and coherent." Tr. 138, lines 4-5.

This fact was further corroborated by USPO Montañez when he testified that he and USPO Pérez arrived at the Defendant's hospital room a few hours later, the Defendant was standing up, fully dressed, and not hooked up to an IV. Tr. 169, lines 22-24. The Defendant greeted them courteously and respectfully, and he made good eye contact. *Id.* "His speech wasn't slurred" and "he was aware of their presence." Tr. 169-70.

And finally, both TFO Colón's and USPO Montañez' testimonies are further corroborated by the Defendant's own admission where, when asked by the prosecutor if he was connected to an IV when the agents interviewed him at the hospital on the morning of April 29, he said "I only had the thing here. I didn't have the cables or anything [of] that sort." Tr. 250, lines 18-22.

Once again, the Defendant's testimony at the hearing contradicts his statements made under penalty of perjury. To secure an evidentiary hearing and pursue suppression of his statements, he initially claimed he was connected to an IV, but later admits while under cross-examination that he wasn't. And if he wasn't, he clearly could not have been receiving "strong pain medication intravenously" like he proclaims in his Unsworn Statement Under Penalty of Perjury. Docket No. 37-1, ¶3.

The Court notes that whether or not he was connected to an IV is not an inconsequential fact because if he was *not* connected to an IV, it undercuts his contention that during the interviews he was in custody and not free to leave the interview with ATF agents and US Probation Officers.

The Court finds that the Defendant again lied in his Declaration Under Penalty of Perjury with respect to 1) his being connected to an IV when interviewed by ATF Agents in the morning hours and by US Probation Officers in the afternoon hours of April 29, 2) his receiving medication through the IV that same day, and 3) his suffering from withdrawal symptoms during both interviews on April 29.

   4. *The Defendant's Declaration Under Penalty of Perjury falsely claims that a) he was never read his Miranda Warnings by ATF Agents, b) he never signed any documentation, and c) he never gave his consent to search his cellphone.*

The Court heard testimony from TFO Colón regarding his interview of the Defendant during the morning hours of April 29 and the reading of the *Miranda* rights to him. The Court finds TFO Colón's testimony, which is corroborated by the document itself, to be wholly credible. The Court therefore summarizes what transpired that day during the interview with respect to the *Miranda* Warnings.

The interview began with TFO Colón explaining to the Defendant the purpose of their visit. After that, SA Orlando De Jesús read the Defendant his *Miranda* rights

from the official ATF approved Form. *See* Exhibit 16; Tr. 138, lines 6-15. The Defendant placed his initials next to each particular right listed at the top of the Form, signed the Form on the signature line, and printed his name below his signature. Tr. 140, lines 15-25. TFO Colón then signed the Form as a witness and affixed the date, "04/29/2021." *Id.* TFO Colón said that all of this occurred between approximately 9:40AM and 10:00AM. Tr. 139, lines 10-11.

The *Miranda* Rights Form itself was admitted into evidence as Government Exhibit 16. The document does in fact have the Defendant's initials next to each right listed at the top of the document. The initials themselves also appear to be written in the same handwriting as the signature of the Defendant and the same handwriting as the "Printed Name" of the Defendant. Moreover, the signature and handwritten name of the witnessing agent appears to be that of a different person than the Defendant. And lastly, the document is duly dated "4/29/2021." After signing the *Miranda* Rights Form, the agents began the interview. Tr. 141, lines 4-5.

The Court finds that the Defendant is not being truthful when he says in his Declaration Under Penalty of Perjury that he did not initial and sign the *Miranda* Rights Form. Indeed, a simple comparison of the Defendant's signature on the *Miranda* Rights Form shows it to be nearly identical to the Defendant's signature on the Consent to Search Form for his cellphone. The Consent to Search Form also contains the signature of TFO Colón acting as a witness again and his signature appears very similar to the one on the *Miranda* Rights Form. Plus, the Consent to Search Form is duly dated "4/29/2021" just like the *Miranda* Rights Form.

TFO Colón explained that at some time toward the end of the interview on April 29, the Defendant was given a consent form to allow the agents to review his cellphone. Tr. 144-45  After the Defendant signed the Consent to Search Form, TFO Colón said he searched the phone in the presence of the Defendant and determined that it had no evidentiary value, so he returned it to the Defendant prior to their leaving the hospital.[11] *See* Ex. 18.

---

[11] The Defendant's consent to search his cellphone was an issue raised in the Motion to Suppress whereby the Defendant sought the suppression of  any evidence gleaned from the search of

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 23

TFO Colón's testimony divulging a lack of inculpatory evidence found on the Defendant's cellphone by its very nature militates in favor of the Defendant and enjoys credibility by the Court. As such, the Court finds that TFO Colón has no incentive to lie as to either the *Miranda* Rights Form or the Consent to Search Form.

The Defendant expressly denies signing a document that contains his initials and signature, however, the Court finds that his denial is nothing but a self-serving statement, which is contradicted by other credible evidence in the record. The Court determines therefore that the Defendant's statements that a) he was not read his *Miranda* rights by the agents, b) he did not sign any documentation, and c) he did not give his consent to search his cellphone cannot be believed.

## B. Evidence to Support a Finding that ATF Agents Interviewed the Defendant on Thursday, April 29, 2021.

TFO Colón, testified that he, ATF SA Jonathan Vega, and ATF SA Orlando de Jesús visited the Defendant in the hospital on April 29, 2021 at approximately 10:00AM to ask him questions related to the April 23 Altercation. TFO Colón provided a detailed explanation of what happened during that interview of the Defendant.

After TFO Colón finished testifying, the Government called SA Peña to the stand to testify about the results of a forensic examination he conducted on the two cellphones belonging to ATF SA Jonathan Vega and TFO Colón. As part of that forensic examination, SA Peña analyzed the metadata of three photos of the Defendant from SA Vega's cellphone and five photos of the Defendant from TFO Colón's phone. All eight of the photos were taken during the interview of the Defendant. Indeed, the metadata for all eight photos confirmed that they were taken on April 29, 2021, at approximately 10:00AM.

Then, because TFO Colón's phone had the GPS/geotagging function enabled, SA Peña was also able to confirm from the geolocation metadata that each of the five photos in TFO Colón's phone were taken at Centro Médico. Tr. 113-114.

---

the cell phone. Because the Government found nothing of value on the phone, there is nothing to suppress. Therefore, any argument raised in favor of suppression related to the cellphone is moot.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 24 of 39

U.S. v. Antonio Díaz-López                                                          Page 24
Crim. No. 21-157 (RAM)(MDM)

Based on this information alone, the Court could determine conclusively that the interview took place on April 29, 2021, at Centro Médico. But there is more.

During his case in chief, the Defendant took the stand and after hearing the mountain of evidence supporting the contention that the interview by ATF Agents took place on April 29 at approximately 10:00AM, the Defendant changed his testimony. Knowing that the original contention in his Declaration Under Penalty of Perjury was that the *Miranda* Waiver Form was signed on the day *after* his interview, which he indicated took place on April 28, 2021, he now claimed that the *Miranda* Waiver Form was not signed at the hospital on April 29, but rather on April 30 at the Juan Domingo Police Precinct.

This drastic change in Defendant's statements from what was argued in the Motion to Suppress and claimed in the Unsworn Declaration Under Penalty of Perjury discredits Defendant's allegations and accounting of the events. This sudden about face after he heard the strong evidence corroborating that the interview took place on April 29 at the hospital and that the *Miranda* Waiver Form and Consent to Search Form were signed on the same date further proves that the Defendant cannot be trusted to tell the truth in this case. It also proves the well-known adage that "one lie begets another."

### C. Defendant's contention that the ATF Agents violated the Defendant's *Miranda* rights when they interviewed him on April 29 is without merit.

The Defendant contends that the ATF Agents violated the dictates of *Miranda v. Arizona, 384 U.S. 436 (1966)*, by reading to him his *Miranda* rights "the day after he was interviewed" in the hospital. According to Mr. Díaz-López, however, the exact date and location where he was read his *Miranda* rights appears to be a moving target. Before the evidentiary hearing, he said that he was read his *Miranda* rights in the hospital on April 29. After the evidentiary hearing, he claimed he was read his *Miranda* rights in the Juan Domingo Police Precinct on April 30. For this reason, the Court has already determined that the Defendant lacks credibility as to when and where he was advised of his *Miranda* rights. Notwithstanding that, however, the

Court finds that upon application of the *Miranda* doctrine to the facts proven at the evidentiary hearing in this case, no violation of its prescriptions by the ATF Agents occurred. The Court explains.

In *Miranda v. Arizona*, the Supreme Court found that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion. 384 U.S. 436, 446-50, 467 (1966). To guard against such coercion, the Court established a prophylactic procedural mechanism that requires a suspect to receive a warning before a custodial interrogation takes place. *Miranda*, 384 U.S. at 444; *see also J.D.B. v. N.C.*, 564 U.S. 261, 269 (2011) (substance of *Miranda* warnings must be given prior to questioning). Unless a suspect is warned of his Fifth Amendment rights, any pretrial statements elicited from him are inadmissible at trial. *Miranda*, 384 U.S. at 492; *see also Mo. v. Seibert*, 542 U.S. 600, 611-12 (2004) (admissibility of custodial confession is conditioned on effectively warning suspect of prescribed rights).

Under *Miranda*, before questioning suspects in custody, law enforcement officials must inform them that (1) they have the right to remain silent, (2) their statements may be used against them at trial, (3) they have the right to the presence of an attorney during questioning, and (4) if they cannot afford an attorney, one will be appointed for them. *Miranda*, 384 U.S. at 467; *see also Cal. v. Prysock,* 453 U.S. 355, 359 (1981) *(per curiam)* (no "talismanic incantation" or rigidly formulaic version of *Miranda* warnings required).

*Miranda* warnings, however, must be given *only* when a suspect is both in custody and subject to government interrogation. (Emphasis added). *See Ill. v. Perkins*, 496 U.S. 292, 297 (1990). "Custody" is defined as the deprivation of "freedom of action . . . in any significant way,"[12] which is determined by asking whether, under the totality of the circumstances, a reasonable person would not feel free to end the encounter with police and leave. *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

---

[12] Howes v. Fields, 565 U.S. 499, 518 (2012) (Ginsburg, J. concurring) (quoting *Miranda*, 384 U.S. at 467)

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 26 of 39

U.S. v. Antonio Díaz-López                                                                    Page 26
Crim. No. 21-157 (RAM)(MDM)

The First Circuit has noted that the determination as to whether a person was in custody or not involves two distinct inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *U.S. v. Infante*, 701 F.3d 386, 394 (2012) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). And something more relevant to the case at hand, when an individual is unable to "leave" the place of the interrogation solely due to circumstances incident to medical treatment, the question is said to be slightly different: whether he or she was at liberty to terminate the interrogation and "cause the [officers] to leave." *Infante*, 701 F.3d at 394 (citing *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007); *see United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007) (whether an individual whose freedom of movement is restricted due to medical treatment is subject to *Miranda* custody depends on "whether a reasonable person would feel free to decline officers' requests or otherwise terminate the encounter" (*quoting Florida v. Bostick*, 501 U.S. 429, 436 (1991)). This approach is consistent with the *Miranda* custody analysis in other contexts where factors independent of the interrogating officers' conduct restrict an individual's freedom of movement. *Infante*, at 394.

The inquiry into whether an individual is in custody for purposes of *Miranda* is one based on the totality of the circumstances. The defendant, however, bears the burden of showing that he was in custody for purposes of *Miranda*.[13] If the court finds that custodial interrogation occurred and the *Miranda* protections apply, the

---

[13] *See United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody"); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (holding that defendant has the initial burden of proving that he was subject to custodial interrogation; if he succeeds, the Government has the burden of showing that defendant voluntarily waived his *Miranda* rights), overruled on other grounds by *United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (*en banc*); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) ("Since [Defendant] has failed to demonstrate that he was subjected to custodial interrogation, we do not find the district court's dismissal of his Miranda claim clearly erroneous."); *United States v. Foley*, 595 F. Supp. 2d 171, 177 (D. Mass. 2009) ("A defendant bears the burden of proving that she was in custody when an incriminating statement was made."); *United States v. Sciolino*, No. 2:09-CR-0070 FCD, 2009 WL 2914570, at *3 (E.D. Cal. Sept. 9, 2009).

Government then must demonstrate that the defendant voluntarily waived his *Miranda* rights for any statements to be deemed admissible against the defendant.[14]

The First Circuit has identified several factors that guide the totality of the circumstances analysis. Those factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Infante*, at 394 (*quoting United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (internal quotation marks omitted)).

In U.S. v. *Infante*, 701 F.3d, 386 (2012), Robert Wayne Infante moved to suppress statements he made to investigators while he was in the hospital receiving treatment after having severed the tip of his finger and lacerated the side of his hand when a propane tank exploded in is home. *Id.* at 388. He claimed that the investigators continued to interrogate him after he had invoked his right to remain silent and to have counsel present. The officers did not advise him of his *Miranda* rights before questioning him claiming that he was not in custody at the time.

The First Circuit found that, based on the circumstances surrounding Infante's questioning, his interview was not custodial because a reasonable person in his position would have felt free to terminate the interviews[15] and ask the officers to leave. In explaining its rationale, the Court stated as follows:

> Although the hospital room where the interviews occurred may not have been a surrounding familiar to Infante, we are satisfied that it was at least a neutral setting. First, Infante went to the hospital of his own accord to receive treatment for his injuries. *See Martin*, 781 F.2d at 673 (in finding no *Miranda* custody where the defendant was questioned in a hospital, emphasizing that the defendant went to the hospital with his brother, and that law enforcement was neither involved in his hospitalization nor

---

[14] *See J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011); *United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) ("The government bears the burden of proving a valid waiver by a preponderance of the evidence.").

[15] The officers conducted two interviews of Infante, approximately one hour and ten minutes apart, while he was in the hospital.

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 28

in extending his hospital stay). Second, hospital staff came and went freely during the course of the interviews, suggesting that the officers were "not in a position to dominate [the setting] as they are, for example, an interrogation room at a jailhouse." *United States v. Jones*, 187 F.3d 210, 218 (1st Cir. 1999).

The number of officers present during the interviews was not overwhelming, lending support to a finding that the questioning was non-custodial. For the most part, only two officers were in the room, joined briefly by two others. *See Hughes*, 640 F.3d at 436 (finding no custody where two officers participated in the questioning *398 and two others remained apart); *United States v. Quinn*, 815 F.2d 153, 157, 161 (1st Cir. 1987) (finding no custody despite presence of five officers).

Although Infante was confined to his hospital bed, with his bandaged hand elevated, the officers did nothing to restrain his movement. *See Jamison*, 509 F.3d at 629 ("[T]o the extent [the defendant] felt constrained by his injuries, the medical exigencies they created . . . should not factor into our [*Miranda* custody] analysis."); New, 491 F.3d at 373–74 (no custody found where the defendant was confined to his hospital bed in a neck brace but no restraint was imposed by the interrogating officer). No officer made physical contact with Infante. *See Hughes*, 640 F.3d at 436 (considering the same as a relevant factor supporting no-custody finding). Nor did the officers act in a threatening manner. Young and Shaw were in plain clothes and their visible weapons remained holstered at all times. *See id.* (although officers carried visible weapons, that no weapon was ever brandished supported a finding that the interrogation was non-custodial).

The duration and nature of the interviews are also consistent with a finding that Infante was not in custody. The interviews were relatively short, lasting approximately twenty-six minutes and twenty-one minutes. *See id.* at 437 (a ninety-minute interview not found custodial); *United States v. Nishnianidze*, 342 F.3d 6, 14 (1st Cir. 2003) (interview lasting forty-five minutes did not implicate *Miranda*). They occurred in the late morning and early afternoon, as opposed to a time that might have appeared more menacing. *See Hughes*, 640 F.3d at 437 (time of day is a factor in the custody analysis).

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 29 of 39

U.S. v. Antonio Díaz-López                                                    Page 29
Crim. No. 21-157 (RAM)(MDM)

> Finally, we note here again that Young informed Infante during each interview that he was not under arrest or in custody and that he did not have to speak with the officers, thereby communicating the non-confrontational nature of the interviews. *See United States v. McCarty*, 475 F.3d 39, 46 (1st Cir.2007) (emphasizing officers' similar statements in concluding that the defendant was not in custody). That Infante at times shared laughs with the officers and even invited one of them to stay in his room between interviews reinforces the notion that the officers' approach was non-threatening. Accordingly, because Infante was not in custody while he was questioned at the hospital, the officers were not required to give him *Miranda* warnings.

*Infante*, at 397-98.

1. *Mr. Díaz-López was interviewed in a neutral setting.*

In this case, the overall facts of Defendant's interview by ATF Agents on April 29 in the hospital prove less coercive than even those in *Infante*. For example, in this case, as with *Infante*, the interview took place in a hospital where the Defendant had been convalescing for the previous six days. As explained in *Infante*, hospitals are generally considered neutral locations.

Mr. Díaz-López had been taken to the hospital in an ambulance and, though he was initially under arrest and being guarded by PRPB officers, after the fourth day of hospitalization, he was released from local police custody. The local police officers left the hospital, and no state charges were ever filed against him. Therefore, when the ATF Agents arrived at the hospital two days later, on April 29, the Defendant was under no limitations as to his freedom of movement.

In addition, there is no indication from the record that agents prevented medical staff from entering the room to tend to issues as needed. Accordingly, like in *Infante*, there is nothing suggesting that the agents were "in a position to dominate [the hospital setting] as they are, for example, in an interrogation room at a jailhouse." The Court finds that this factor militates against finding that Mr. Díaz-López was in custody.

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 30

### 2. The number of officers was "not overwhelming."

Here, there were a total of three ATF agents present during the interview, however, only two of them posed most, if not all, of the questions asked of Mr. Díaz-López. *See* Exhibits 17, 18 and 19. The Court finds that the number of agents, being less than the four present during the interview in *Infante,* militates against a finding that Mr. Díaz-López was in custody.

### 3. Mr. Díaz-López was placed under no physical restraint during the interview.

During his interview, Mr. Diaz-López was not placed in handcuffs and his freedom to move around the room or even leave the room was unconstrained. At no time did the agents convey to Mr. Díaz-López that he was not free to leave the hospital or terminate the interview.

In fact, unlike in *Infante*, in this case the ATF Agents read the *Miranda* warnings to Mr. Díaz-López before posing questions to him. In addition, TFO Colón testified credibly that during the interview Mr. Díaz-López went to the bathroom alone a couple of times while the agents waited for him to return. Though Defendant disputes the fact that he went to the bathroom during the interview, the Court does not find Mr. Díaz-López' testimony to this effect credible.

It is also salient that even though TFO Colón indicated that the ATF Agents were carrying weapons during the interview, Defendant admitted during his examination that the weapons were not visible to him. He also admitted during the evidentiary hearing that he was not under arrest when the ATF Agents interviewed him. Tr. 246, lines 3-4; Tr. 249, lines 9-15. These facts buttress the Court's determination that the ATF Agents did not make any effort to restrain Defendant physically or emotionally during his interview and that the interview was non-custodial.

Furthermore, the Court has already found as a matter of fact that, while Mr. Díaz-López might have still had an IV port/catheter in his arm, he was not connected to an IV while the ATF Agents were in his room.

Accordingly, the Court finds that the lack of any type of physical or mental restraint by the ATF Agents over the Defendant militates against a finding the Mr. Diaz-López was in custody.

> 4. *The duration and character of the interrogation both militate against a finding that Mr. Díaz-López was in custody.*

Here, the ATF Agents arrived at Mr. Díaz-López' hospital room around 9:40AM on April 29. When they arrived, Mr. Díaz-López was sitting alone in bed. There was no one else in the room—no PRPB Officers, no friends and no family members. Exhibits 17, 18 and 19. Around 9:50AM, the agents began the interview, which lasted roughly one hour. The atmosphere in the room was professional with no yelling and no threats being made. *Id.* Indeed, after the agents reviewed the Defendant's cellphone and found nothing inculpatory therein, they returned the phone to him before leaving the room. And, when they left the room after concluding the interview, Mr. Díaz-López remained in the room awaiting his discharge from the hospital.

In conclusion, the Court finds that there is no credible evidence, and the Defendant has not met his burden, to support the conclusion that he was in custody when the ATF Agents interviewed him during the morning hours of April 29. Therefore, the Court recommends that the Defendant's Motion to Suppress the statements he made to ATF Agents on April 29 based on a violation of his *Miranda* rights be **DENIED**.

## D. Defendant's contention that the U.S. Probation Officers violated his *Miranda* rights when they interviewed him on April 29 is without merit.

In his Motion to Suppress the Defendant raised the same *Miranda*-type challenge to the incriminating statements he made to USPO Pérez and USPO Montañez that he made regarding the statements made to ATF Agents. Docket 37 at 11. A close review of his post-hearing brief, however, contains no mention of a challenge to the statements made to the U.S Probation Officers and it is not entirely clear therefore whether the Defendant has abandoned that argument. Nevertheless, the Court finds that Defendant's interview by the U.S. Probation Officers on April 29

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 32

without advising of his *Miranda* rights did not constitute a violation of his constitutional rights. The Court explains.

As discussed in subsection III (C) above, *Miranda* warnings must be given *only* when a suspect is both in custody and subject to government interrogation. *See Ill. v. Perkins*, 496 U.S. 292, 297 (1990). As further explained below, the Court finds that the Defendant was not in custody when he was interviewed by the U.S. Probation Officers and, therefore, there was no need to advise him of his *Miranda* rights. The Court applies the same four factors identified by the First Circuit in *United States v. Hughes,* 640 F.3d 428, 435 (1st Cir. 2011), to determine that the Defendant in this case was not in custody during his interview by U.S. Probation Officers on April 29.

The first factor is whether the Defendant was questioned in a familiar or neutral place. The case law is clear that a hospital room is generally considered a neutral location. *Infante*, at 397-98. Here, like the ATF Agents before them, USPO Pérez and USPO Montañez interviewed the Defendant in his hospital room, a setting where they did not exercise access control. When they entered the room, the Defendant was standing up and fully dressed. Tr. 169, lines 22-24. He greeted them courteously and respectfully and he made good eye contact. The Court finds that this factor militates against finding that the Defendant was in custody during the interview.

The second factor is the number of law enforcement officers present at the scene. Here, only USPO Pérez and USPO Montañez were present during the interview. No one else participated. This factor also militates against finding that the Defendant was in custody during the interview.

The third factor is the degree of physical restraint placed upon the Defendant during the interview. Regarding this matter, USPO Montañez credibly testified that when the U.S. Probation Officers entered the room, like during the prior interview by the ATF Agents, the Defendant was not physically connected to an IV. As a matter of fact, no evidence was presented on the record that may have indicated that the Defendant was physically restrained in any way during the interview by the U.S.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 33 of 39

U.S. v. Antonio Díaz-López                                                    Page 33
Crim. No. 21-157 (RAM)(MDM)

Probation Officers on April 29. This factor also militates towards a finding of a non-custodial interview by the U.S. Probation Officers.

The fourth factor is the duration and character of the interrogation. USPO Montañez testified that the interview lasted approximately 40-45 minutes and that the tone was professional and cordial. USPO Pérez explained to the Defendant that the purpose of the interview was to obtain information regarding the police intervention with Defendant because of the April 23 Altercation. She also informed him that she would file a motion to the Court based on the preliminary information gathered in her investigation and that the information provided to the Court in the motion could result in his arrest. Tr. 171, lines 4-8. In response, the Defendant said, "I'm okay. I understand. I'll be waiting for whatever happens." Tr. 171, 8-9. Once the interview concluded, USPO Pérez and USPO Montañez left the hospital and the Defendant remained in his hospital room waiting to be discharged. This last factor also militates against finding that the Defendant was in custody during the U.S. Probation Officer's interview.

In conclusion, the Court finds that there is no credible evidence, and that the Defendant has not met his burden, to support the conclusion that the Defendant was in custody when the U.S. Probation Officers interviewed on April 29, 2021. Therefore, the Court recommends that Defendant's Motion to Suppress the statements he made to the U.S. Probation Officers on April 29, based on a violation of his *Miranda* rights, be **DENIED.**

### E. Defendant's contention that his statements to ATF Agents and U.S. Probation Officers were involuntary is without merit.

Defendant claims that his statements to ATF Agents and U.S. Probation Officers on April 29 should be suppressed as violative of his due process rights because on that day he was suffering from: (a) severe pain resulting from a gunshot wound to the head, (b) the effects of withdrawal from cocaine addiction, and (c) the effects of opioid treatment for both of those conditions. He alleges that these conditions rendered him incapable of making voluntary statements to the federal officers that interviewed him on that day.

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 34 of 39

U.S. v. Antonio Díaz-López                                                    Page 34
Crim. No. 21-157 (RAM)(MDM)

1. *Voluntariness assessment requires an evaluation of the totality of the circumstances of the interviews.*

"The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession." *United States* v. *Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). "In assessing whether a confession is voluntary, courts must inquire 'whether the will of the defendant had been overborne so that the statement was not his free and voluntary act.'" *Id.* (quoting *Bryant* v. *Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986)). "To make a voluntariness determination, [courts] engage in a 'totality of the circumstances' inquiry." *United States* v. *Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015). "This requires [courts] to balance the officers' tactics with the unique background of each individual suspect." *Id.*

"Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect." *Hughes*, 640 F.3d at 438. "They also may include an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state," *id.*, as well as "any prior experience with the criminal justice system." *Hufstetler*, 782 F.3d at 25. It is important to acknowledge, however, that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). See e.g., *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (schizophrenia without allegation of coercive police conduct insufficient to find confession involuntary); *United States v. Annis*, 446 F.3d 852, 856 (8th Cir. 2006) (pain and meth withdrawal symptoms without evidence of police coercion is not enough for finding of coercion).

2. *The interviews of April 29 by ATF Agents and U.S. Probation Officers did not implicate police overreaching or coercive police activity.*

As previously explained by the Court, the interviews of the Defendant conducted by the ATF Agents and the U.S. Probation Officers on April 29 while he was hospitalized at Centro Médico were non-custodial interrogations in a neutral setting where the federal officers did not exercise any access control to the room or

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 35

otherwise restrain the Defendant. The Defendant was not tethered to an IV, he was able to move about the room and use the bathroom on his own, and he was not arrested during or immediately after either of the interviews.

The length and nature of the questioning were likewise reasonable, approximately one hour for the ATF interview by three officers and between 40 and 45 minutes for the interview conducted by the two U.S. Probation Officers. The record did not reveal that Defendant was deprived of any essentials or any necessary treatment during the interviews.

The record developed at the evidentiary hearing did establish that no promises or threats were made to the Defendant by any of the federal officers during either interview. The ATF Agents, for example, never showed their weapons to the Defendant during the interview and the U.S. Probation Officers clearly explained to him the purpose of the interview and that his statements would be disclosed to the Court as part of his ongoing supervision.

The federal officers conduct during both interviews of April 29 as described in the testimony developed at the evidentiary hearing conforms fully with reasonable professional standards. No misconduct by any of the implicated federal officers warranting suppression has been revealed, much less proven, through Defendant's claims.

3. *Defendant's mental state and personal attributes were adequate and sufficient for him to voluntarily respond to questions presented by the federal officers on April 29.*

As previously explained in subsection III(A)(2) above, the record developed at the evidentiary hearing demonstrated that Defendant did not suffer pain nor was he given any pain medications during his hospitalization from April 24-29 for pneumonia and kidney disfunction.[16] Dr. Cantero testified that pneumonia and kidney dysfunction, the conditions for which Defendant was admitted, generally do not cause pain, Tr. 81, lines 10-16, and that this was so in Defendant's case. Tr. 81,

---

[16] The Court has previously found Defendant's claim that he suffered a gunshot wound to the head to be false. See subsections II(D) and III(A)(1).

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 36 of 39

U.S. v. Antonio Díaz-López                                                    Page 36
Crim. No. 21-157 (RAM)(MDM)

lines 20-22. Dr. Cantero also averred that from his initial evaluation (Tr. 43.) through his entire hospitalization Mr. Díaz-López did not suffer the symptoms of cocaine withdrawal (to wit nausea, headaches, stomach aches, muscle pain, or difficulty concentrating); that he was "pain free." Tr. 61-68.

It was for this reason that, as admitted by the Defendant at the evidentiary hearing, Dr. Cantero did not prescribe pain medication for the Defendant during his hospital stay. Tr. 245, lines 12-14. Indeed, Dr. Cantero testified that on April 29, the day of both interviews now being challenged, the Defendant was "alert, he was active and oriented times 3. He was in no distress." Tr. 74, lines 9-10.

This expert opinion was corroborated by TFO Colón, whose testimony the Court also finds highly credible, when he explained that when he and his colleagues arrived at the Defendant's hospital room on April 29 the Defendant was "completely alert," "not drowsy." Tr. 138, lines 2 4; Tr. 250-251. "He was completely normal, lucid and coherent." Tr. 138, lines 4-5. USPO Montañez likewise corroborated Dr. Cantero's opinion that Defendant was lucid and alert. USPO Montañez indicated during the evidentiary hearing that based on his twenty years of experience supervising convicted criminals, on April 29 the Defendant "was well, he was lucid," and "he was coherent in both time and space. There was no indication that he was under the influence of anything." Tr. 170, lines 18-21.

Defendant's evident mental acuity combined with his personal characteristics militates towards a finding that he was fully capable of providing voluntary statements to federal officers during the interviews of April 29. *Cf.* string of cases standing for proposition that agent testimony that defendant was calm, cooperative, responsive, alert, and coherent led to finding of voluntariness despite the use of drugs or alcohol, exhaustion, sleeplessness or mental illness. *United States v. Gaddy*, 532 F.3d 783, 788-789 (8th Cir 2008); *United States v. Burson*, 531 F.3d 1254, 1259-1261 (10th Cir. 2008); *United States v. Phillips*, 506 F.3d 685, 687 (8th Cir. 2007); *United States v. Coombs*, 857 F.3d 439, 450 (1st Cir 2017).

Defendant is a 45-year-old man who has completed his Grade Equivalency Degree, has no history of mental illness, and has been arrested and convicted on

multiple occasions for felony offenses. His education and life experiences make him an individual duly equipped to handle a non-custodial interview in a neutral setting.

Accordingly, the record developed in this case, contrary to Defendant's baseless allegations in the Unsworn Declaration Under Penalty of Perjury, does not reveal facts that intimate, let alone prove, that Defendant's will was unduly overborne by the federal agents interview tactics or due to a susceptible mental deficiency. The federal agents did not use unduly oppressive interview tactics during their interviews that would warrant suppression of any statement gathered through such techniques, and the Defendant did not suffer from any mental or emotional vulnerability that made him unduly suggestible by the federal agents. Based on the totality of the circumstances, the Court recommends that Defendant's Motion to Suppress the statements he made to ATF Agents and U.S. Probation Officers on April 29 based on an allegation of involuntariness under the Due Process Clause be **DENIED**.

### F. There is no prompt presentment violation in this case.

Defendant claims that the statements he made to ATF Agents and U.S. Probation Officers on April 29 should be suppressed because they were made in violation of the prompt presentment requirements established by Federal Rule of Criminal Procedure 5(a)(1)(B). He bases his claim on the fact that he was presented before Magistrate Judge Vélez Rivé on May 3, 2021, for his initial appearance on the Motion Notifying Violations of Conditions of Supervised Release after having been arrested by ATF Agents in the afternoon of April 29, 2021 at approximately 4:00PM.

1. *Rule 5 and the McNabb-Mallory rule do not require suppression of voluntary statements procured prior to arrest despite a subsequent unreasonable delay in presentment.*

The Federal Rules of Criminal Procedure require that a defendant be brought "without unnecessary delay before a magistrate judge." *United States v. Jacques*, 744 F.3d 804, 813 (1st Cir. 2014) (citing Fed. R. Crim. P. 5(a)(1)(A)); *see also* Fed. R. Crim. P. 32.1 (establishing a similar requirement where a person is held in custody for violation of supervised release). "To protect this right, the *McNabb-Mallory* rule

Case 3:21-cr-00157-RAM-MDM   Document 116   Filed 10/03/23   Page 38 of 39

U.S. v. Antonio Díaz-López
Crim. No. 21-157 (RAM)(MDM)

Page 38

established by the Supreme Court stipulates that confessions made during a period of detention that violates the prompt presentment requirement of Rule 5(a) are generally inadmissible in federal courts." *Jacques*, 744 F.3d at 813. Section 18 U.S.C. § 3501, however, created a "safe-harbor for voluntary statements that are received either within six hours of a defendant's detention, or within a longer period deemed reasonable in light of travel or transportation difficulties." *Id.* Congress further provided that "[n]othing contained in this section shall bar the admission in evidence of any *confession made or given voluntarily by any person* to any other person without interrogation by anyone, or *at any time at which the person who made or gave such confession was not under arrest or other detention*." 18 U.S.C. § 3501(d).

To conduct a prompt presentment analysis, the courts must first determine whether the challenged statements occurred within six hours of the defendant's arrest, and if not, whether there was a reasonable excuse for the delay in presentment. *United States v. Pagán Santos*, No. 19-068, 2022 WL 2447684 (D.P.R. Uly 6, 2022). "It bears noting, however, that when ruling on a motion to suppress based on the *McNabb-Mallory* rule, the determination by the court is whether there was an unreasonable delay [in presentment] *at the time the confession was made*." *Id.* (citing *Upshaw v. United States*, 335 U.S. 410, 413 (1948); *United States v. Mitchell*, 322 U.S. 65, 70 (1944)) (emphasis in original). This analysis is important because "a subsequent illegal detention [in violation of the *McNabb-Mallory* rule] does not retroactively change the circumstances under which the suspect made his confession." *Id.* (citing *Upshaw*). "This is so because a voluntary and admissible self-incriminating statement cannot be said to have been procured by subsequent wrongful detention." *Id.* (citing *Mitchell*, 322 U.S. at 70). Accordingly, a confession made within six hours of arrest that is otherwise voluntary does not violate Rule 5 or *McNabb-Mallory* even if a later presentment is unreasonably delayed. *See United States v. Casillas*, 792 F.3d 929, 931 (8th Cir. 2015).

Case 3:21-cr-00157-RAM-MDM  Document 116  Filed 10/03/23  Page 39 of 39

U.S. v. Antonio Díaz-López                                                              Page 39
Crim. No. 21-157 (RAM)(MDM)

2. *The statements made by the Defendant are not the fruits of a violation of Rule 5 or the McNabb-Mallory rule.*

In this case, the statements the Defendant seeks to suppress were voluntary statements made prior to his arrest. *See* subsections III(E). By Defendant's own account, he made his incriminatory statements during the interviews of April 29, when he was *not under arrest or other detention*. The statements were, accordingly, made before the alleged delay in taking him before a judicial officer and "cannot be said to have been procured by subsequent wrongful detention." Rule 5 and the *McNabb-Mallory* rule are inapposite to the facts in this case. The Court, therefore, recommends that Defendant's Motion to Suppress the statements he made on April 29 to ATF Agents and U.S. Probation Officers for violation of the prompt presentment requirements be **DENIED**.

## IV. CONCLUSION

Because the Court finds (a) no violation of the Defendant's *Miranda* rights during either of the interviews conducted on April 29, (b) that Defendant's statements during both interviews on April 29 were voluntary, and (c) that there are no prompt presentment violations in this case, it is hereby recommended that the Defendant's Motion to Suppress (Docket No. 37) be **DENIED**.

**IT IS SO RECOMMENDED.**

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir.1994); *United States v. Valencia Copete*, 792 F.2d 4 (1st Cir.1986).

In San Juan, Puerto Rico, this 3rd day of October 2023.

*s/Marshal D. Morgan*
MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE